## Mon Road Water Association Right of Way

260

*Charles C. Keller*, for Commonwealth.

*Francis H. Patrono*, for condemnees.

McCUNE, J., January 19, 1967.—Trustees for the Mon Road Water Association, an unincorporated association of home owners, petitioned for the appointment of viewers to assess damages for the taking of a water line and an alleged right of way upon which the line rested in South Strabane Township in this county. The Commonwealth has obtained a rule calling on trustees to show cause why the appointment of the viewers should not be set aside on the grounds that no taking of any property occurred which would create liability on the part of the Commonwealth.

Sometime before the construction of the interstate highway through South Strabane Township, the home owners required city water. It was necessary that they finance construction of a pipeline to their homes, so they associated together, appointed three of their number trustees to act for them, called themselves the Mon Road Water Association and raised sufficient money to pay Citizens Water Company (the local public utility) to build a pipeline to their homes. They all lived along a State highway then known as route 31, as it ran east from Washington toward Monongahela. Their properties fronted on said road. They obtained a permit (called an occupancy permit) from the State to place the water line within the highway, and they gave their trustees easements to lay the pipeline within the highway right of way. The easements they

granted were carefully limited so as to be located "within the present limits of the right of way of the Commonwealth of Pennsylvania for the said Pennsylvania Highway Route 31".

With the line resting within the State right of way for route 31, supported by the permit (the permit ran to Citizens Water Co.) and the easements granted by the members of the association, water was thought to be assured for each home.

The interstate road, running north, cut directly across route 31 at some depth, severing the water line. The State permitted it to be replaced in route 31, where it is now supported by a bridge crossing the interstate road, but the cost of replacing it was substantial, and the members of the association contend they possessed property rights which are compensable.

They cannot rest their contention on the permit, because it was conditional.

The occupancy permit contained, among other conditions, the following:

"If at any time in the future the highway is widened or the alignment or grades changed, the permittee further agrees to the extent now or hereafter required by statutory or common law, to change or relocate, at its own expense, any part of the structures covered by this permit which interferes with the improvement of the highway, to such location within the limits of the legal right of way of the highway as may be directed by the permitter or local authorities".

Petitioners argue that route 31 was not merely widened and grades changed, but it was so physicially severed that they were not subject to the conditions in the permit.

It is true that route 31 was cut, in addition to being substantially changed at the site of the bridge, but in Philadelphia Suburban Water Co. v. Pennsylvania Public Utility Commission, 168 Pa. Superior Ct. 360

(1951), it was held that a permit to occupy a highway right of way is a defeasible privilege, not a contract with the Commonwealth, and that it is not a property right.

In view of the Philadelphia Suburban Water case, supra, the occupancy permit gave petitioners no property right which was compensable. We conclude that the permit permitted the Commonwealth to cut across route 31 as well as to change its grade or widen it. It was up to petitioners to pay the expense of relocating the line which has now been relocated. We assume this was done under the same or a new occupancy permit. To say that the Commonwealth could change the grade or widen the road but could not cut across the road would be unreasonable.

Petitioners contend, however, that the easement given trustees by the property owners was also cut, and this was an easement in fee and, as such, a property right which is compensable because the cutting of it destroyed it. This is not so, in our judgment. The easement still exists. It was nothing but permission by the abutting property owners to have the water line placed in the right of way of route 31 and permission that it stay there. They carefully limited their easements so that all they gave was permission that the water line pass over their properties within the confines of route 31. They gave permission to each other. Trustees of the association merely negotiated for the members with the Citizens Water Company and with the State. Trustees and the members were one and the same and, we repeat, all the easement amounted to was consent that the water line exist. There was no legally cognizable difference in the identity of the members and trustees. As we understand it, trustees had no duties distinguishable from the duties of the property owners themselves. They were trustees of a dry trust, to put it another way. Once the line was in place and

the permit obtained, trustees had accomplished their purposes.

This consent was required, no doubt, because all the State had in route 31 was an easement for public purposes. The water line was used for private purposes, and it is conceivable that if one of the property owners sold his property with no consent recorded (and the pipe buried so as not to be visible), some purchaser could have required the members to remove the water line from his property. For this reason, it was prudent to record the easement running from the members to trustees. The same purpose could have been accomplished by recording a consent by each property owner that the line cross over his property or by recording individual grants from each individual property owner to trustees. There is no magic in the fact that several owners granted an easement to three trustees in one instrument.

All parties recognized that consent of the individual owners should be given because of the State's limited right in the easement for public use over the strip of land in question. The State permit recognized this when it stated that the permission granted did not relieve permittee from obtaining any consent otherwise required from the owners of abutting property.

We repeat that the Commonwealth destroyed nothing but the pipe itself.

The occupancy permit still exists, or one equally as good, and the easements or consents are still on record and are still effective to permit the pipe to stay in place.

The pipe had value, but is the cost of replacing it compensable? We think not, because the pipe was not such a property right as the law countenances in eminent domain.

Suppose the pipe was cut in changing the grade of route 31. No one contends the State would have to

pay for its replacement. If route 31 had been widened and the pipe cut, no different result would obtain.

The general rule can be stated as follows: If private use is permitted by the State of an easement it has condemned for public use, the private users have no property rights compensable in eminent domain. See Philadelphia Suburban Water Co. case, supra.

Accordingly, this order is made:

ORDER

And now, January 23, 1967, the appointment of viewers is vacated. Record costs shall be paid by the members of Mon Road Water Association.